Andrew K. Jacobson (CSBN: 148583)
andy@bayoaklaw.com
BAY OAK LAW
1939 Harrison Street, Suite 929
Oakland, CA 94612
Telephone: (510) 209-5500

Benjamin D. Salvina (*pro hac vice*)
bsalvina@karpf-law.com
KARPF, KARPF & CERUTTI, P.C.
8 Interplex Drive, Suite 210
Feasterville-Trevose, PA 19053
Phone: (215) 639-0801
Fax: (215) 639-4970

Attorneys for Plaintiffs
AMY SOON, AIKSHEE LOH, and BLU3
FOUNDATION, LLC d/b/a BLU3 DAO,
A Delaware Limited Liability Company

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION**

| | |
|---|---|
| AMY SOON; AIKSHEE LOH; BLU3 FOUNDATION, LLC d/b/a BLU3 DAO, A Delaware Limited Liability Company,<br><br>*Plaintiffs*,<br><br>vs.<br><br>CAMILA RAMOS GARZON; WOMEN BUILD WEB3,<br><br>*Defendants*. | Case No. 4:23-cv-05189-HSG<br><br>CIVIL ACTION<br><br>JURY TRIAL DEMANDED |

**FIRST AMENDED COMPLAINT**

Plaintiffs, by and through their undersigned counsel, hereby aver as follows:

**INTRODUCTION**

1. This action has been initiated by Amy Soon, Aikshee Loh, and Blu3 Foundation, LLC, d/b/a Blu3 DAO (hereinafter referred to collectively as "Plaintiffs," unless indicated

KARPF, KARPF, & CERUTTI P.C.
(Pro Hac Vice Counsel)
8 Interplex Drive, Suite 210
Feasterville-Trevose, PA 19053
Phone: 215.639.0801
Fax: 215.639.4970

BAY OAK LAW
1939 Harrison St, Suite 929
Oakland, CA 94612
Phone: 510.208.5500
Fax: 510.208.5511

otherwise) against Camila Ramos Garzon and Women Build Web3 (hereinafter referred to collectively as "Defendants," unless indicated otherwise) for defamation, tortious interference with actual or prospective contractual relations, and violations of the Lanham Act, 15 U.S.C. §§ 1051 *et. seq*. for statutorily prohibited trade libel.

## JURISDICTION AND VENUE

2.   This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under a law of the United States and seeks redress for violations of a federal law (the Lanham Act). There lies supplemental jurisdiction over Plaintiff's state-law claims because they arise out of the same common nucleus of operative facts as Plaintiff's federal claim(s) asserted herein.

4.   This Court may properly maintain personal jurisdiction over Defendants because their contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendants to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the Supreme Court of the United States in *International Shoe Co. v. Washington,* 326 U.S. 310 (1945) and its progeny.

5.   Venue is properly laid in this District pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2), because Defendants conduct a vast amount of business in this judicial district and the actions and/or omissions giving rise to the legal claims set forth herein occurred from this District.

## PARTIES

6.   The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

7.   Amy Soon (hereinafter, "Soon" where referred to individually) is an adult individual, residing and domiciled in the State of California.

KARPF, KARPF, & CERUTTI P.C.
(Pro Hac Vice Counsel)
8 Interplex Drive, Suite 210
Feasterville-Trevose, PA 19053
Phone: 215.639.0801
Fax: 215.639.4970

BAY OAK LAW
1939 Harrison St, Suite 929
Oakland, CA 94612
Phone: 510.208.5500
Fax: 510.208.5511

8. Aikshee Loh (hereinafter, "Loh" where referred to individually) is an adult individual, residing and domiciled in the State of New York.

9. Blu3 Foundation, LLC, d/b/a Blu3 Dao (hereinafter, "Blu3" where referred to individually) is a Delaware limited liability company, with a registered agent for service of process c/o Corporation Service Company located at 251 Little Falls Drive, Wilmington, DE 19808. Blu3's operations are outlined more *infra*.

10. Camila Ramos Garzon (hereinafter, "Garzon" where referred to individually) is an adult individual believed and therefor averred to be residing either in the State of California or the Republic of Colombia.

11. Women Build Web3 (hereinafter, "WBW3" where referred to individually) is believed and therefore averred to be an unincorporated association operating in California and/or abroad. Defendant WBW3's operations are outlined more *infra*.

12. Blu3 and WBW3 both operate as a Decentralized Autonomous Organization (hereinafter, "DAO"), which is a member-owned, blockchain-based entity governed by transparent financial transactions rather than a central authority.

13. Blu3 was in the beginning stages of operating as a DAO before ceasing operations as a direct result of Defendants' false and defamatory statements that were specifically designed to target damage Blu3, Soon, and Loh.

14. Both Blu3 and WBW3 DAOs operate in the Web3 space, which is an emerging, decentralized iteration of the internet built on blockchain technology that shifts control from centralized corporations to individual members.

15. A "blockchain" is a shared, digital ledger that is distributed across many computers such that it is transparent because new entries ("blocks") are linked to old ones, forming a secure and unalterable chain that is readily accessible to the public.

**KARPF, KARPF, & CERUTTI P.C.**
(Pro Hac Vice Counsel)
8 Interplex Drive, Suite 210
Feasterville-Trevose, PA 19053
Phone: 215.639.0801
Fax: 215.639.4970

**BAY OAK LAW**
1939 Harrison St, Suite 929
Oakland, CA 94612
Phone: 510.208.5500
Fax: 510.208.5511

16. The members of a DAO, such as Blu3 and WBW3, share a common purpose and vote on their respective DAO's decisions and management of the DAO's funds.

17. Blu3's voting was governed by committee members, with each member getting one (1) vote.

18. The primary purpose of both Blu3 and WBW3 is to allows their respective members to collaborate, raise funds, manage resources, and distribute funding.

19. DAOs generally operate with "token-holders," and each member's voting power is governed by the number of tokens that each member holds.

20. A DAO generally operates with "smart contracts," which are self-executing codes on a blockchain, to manage their operations.

21. At the time when Defendants made false and defamatory statements about Plaintiffs, Blu3 was in the process of distributing tokens to its members as a path to further advance their DAO, to incentives members, and to compensate them for their voluntary work effort.

22. Because DAOs like Blu3 operate as a public blockchain, all of their financial transactions are transparent and verifiable.

23. Both Blu3 and WBW3 DAOs have no restriction on the geographic location of their respective members, resulting in the growth potential of an international organization.

24. Twitter (now entitled "X") is the main forum for discussion and communication in the DAO and Web3 world.

25. A DAO that is similar in all relevant respects to both WBW3 and Blu3 has been recognized as an unincorporated association that can be sued in the State of California by at least one court in the Ninth Circuit. *See e.g. Commodity Futures Trading Comm'n v. Ooki DAO*, 2022 U.S. Dist. LEXIS 228820, at *11-23 (N.D. Cal. Dec. 20, 2022).

26. Soon is an extremely accomplished professional who is very well educated, has over a decade of experience working within some of the most prominent companies and financial enterprises in the United States, and she is an author. These credentials (naming only some) are in addition to Soon being a founder of various companies, inclusive of Blu3.

27. Like Soon, Loh is also an exceedingly accomplished professional. Loh is very well educated, has more than fifteen (15) years of experience working in nationally renowned private equity and financial conglomerates, and she has founded several companies inclusive of Blu3.

28. Soon and Loh are founders and token-holders of Blu3.

29. Soon and Loh founded Blu3 with the mission of empowering women to achieve financial freedom within the Web3 world.

30. Blu3 operates by providing education, web3 experiential learning, technical workshops, educational talks, technology bootcamps, and funding for its members to succeed in the male-dominated Web3 world.

31. Ramos is a founding member of WBW3 and is identified on WBW3's website as WBW3's Business Development Lead/Software Engineer.[1]

32. According to its published whitepaper, WBW3 is a "community of women and non-binary people unlocking the next wave of developers in web3 by providing education, opportunities, and funding."[2]

33. WBW3's members include "software engineers (frontend, backend, full-stack, and blockchain), designers (visual, UX/UI, product), content creators, technical writers, product and project managers, and founders with wide-ranging experiences in tech and web3."[3]

---

[1] *See* https://womenbuildweb3.vercel.app/members (Accessed February 5, 2026).
[2] *See* WBW3's whitepaper, published on April 15, 2022, available at https://womenbuildweb3.hashnode.dev/whitepaper (Accessed February 5, 2026), attached as Exhibit A.
[3] *Id.*

34. WBW3s mission is to "develop complex decentralized apps and social goods, transition into web3 full-time, and overall, have a sizable, meaningful impact in this space."[4]

35. To achieve its mission, WBW3 provides: (1) education, mentorship, and resources focused on software development and blockchain technology; (2) structured opportunities and predictable outcomes to apply technical knowledge and skills with end-to-end support from onboarding to job placement with collaboration from ecosystem partners; and, (3) funding for active participation, contributions, and projects.[5]

36. WBW3 provides funding for members to take part in "personal and professional development initiatives such as workshop, hackathons, networking events, and study groups . . . ."[6]

37. Upon information and belief, much of the content of WBW3's whitepaper was taken directly from Blu3's whitepaper that was published only approximately two (2) months earlier in or around February 2022.[7]

38. Content that WBW3's whitepaper took directly from Blu3's whitepaper include, but is not limited to: (1) both state that they are designed to attract women and other underrepresented communities in the Web3 world; (2) both prioritize onboarding members to the Web3 world; (3) both highlight using education as the primary tool for success; (4) both emphasize a community-first philosophy wherein peers mentor and support each other; (5) both advertise opportunities for actively participating in the Web3 world with grant opportunities; (6) both actively plug participation in conferences such as ETH events, hackathons, and ecosystem gatherings within the broader Ethereum/Web3 builder culture; (7) both are written in a narrative that focuses on diversity,

---

[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *See* Blu3's whitepaper, published February 2022, available at https://talk.harmony.one/t/blu3-dao-funding-proposal-ethdenver-2022/11992 (Accessed February 5, 2026), attached as Exhibit B.

- 6 -

FIRST AMENDED COMPLAINT *SOON et al. v. GARZON, et al.*

equity, and inclusion in the Web3 space; and, (8) both promote global participation that includes remote/hybrid engagement with an international community mindset.

39. WBW3's Instagram account's tagline is "Build. Learn. Earn."[8] Blu3's three (3) mandates in its whitepaper are "Learn" "Earn" and "Play."[9] WBW3 clearly lifted its tagline directly from Blu3's whitepaper.

40. Blu3 and WBW3 directly compete with one another by targeting the same community of women in the Web3 world in order to, *inter alia*: (1) recruit more members; (2) increase their own influence in the Web3 world by obtaining more members; (3) provide their members with education, mentorship, and resources; (4) maximize their own sources of funding to support their members' personal and professional development initiatives; and, (5) expand the overall influence of women in the male-dominated Web3 ecosystem.

41. At all times relevant herein, Defendants acted by and through their agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendants.

## FACTUAL BACKGROUND

42. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

43. Prior to mid-October of 2022, Soon and Loh have had **impeccable** reputations, have been widely acknowledged and recognized for their philanthropic intentions, and had been praised in many forums (inclusive of their tremendous online presence).

---

[8] *See* Screenshot of WBW3's Instagram Account, attached as Exhibit C.
[9] *See* Blu3 Whitepaper, Exhibit B.

FIRST AMENDED COMPLAINT *SOON et al. v. GARZON, et al.*

KARPF, KARPF, & CERUTTI P.C.
(Pro Hac Vice Counsel)
8 Interplex Drive, Suite 210
Feasterville-Trevose, PA 19053
Phone: 215.639.0801
Fax: 215.639.4970

BAY OAK LAW
1939 Harrison St, Suite 929
Oakland, CA 94612
Phone: 510.208.5500
Fax: 510.208.5511

44. Before Defendants posted their false and defamatory statements, Blu3 had achieved great success in the Web3 world, as outlined in Blu3's Global Overview & Highlights published in or around September 2022.[10]

45. By mid-October of 2022, Blu3 was widely recognized as a leading women-focused DAO in the Web3 ecosystem and was acknowledged as an industry leader by both Mastercard and Ethereum.[11]

46. Within approximately one (1) year, Blu3 had sponsored over 250 women and non-binary individuals to participate in hackathons and Web3 conferences worldwide, including major technology hubs such as Denver, Miami, Amsterdam, Rio de Janeiro, New York City, and Bogotá.[12]

47. Blu3-sponsored participants received multiple awards, including recognition as the first all-women team to win ETH Amsterdam.[13]

48. As a direct result of these opportunities, many Blu3-sponsored participants secured employment, professional advancement, and/or funding within the Web3 industry.[14]

49. Commencing in mid-October of 2022, Defendants initiated an online campaign dedicated to discrediting, defaming, and completely disrupting operations of Blu3. There can be no other reasonable (or alternative) interpretation of Defendants' malicious behavior.

50. Plaintiffs had (prior to mid-October of 2022) engaged in nothing but altruistic motives, empowered the community, worked very hard, built an outstanding reputation, and created a solid platform and corporate foundation.

---

[10] *See* Blu3 Global Overview & Highlights, published in or around September 2022, available at https://blu3tofly.notion.site/Blu3-Global-Overview-Highlights-95e78e4727174b399915ca42ef9cd608 (Accessed February 5, 2026), attached as Exhibit D.
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.*

51. On October 13, 2022, Defendants issued public statements on Twitter stating *inter alia*:[15]

   a) Specifying Plaintiffs, "there have been things around their finances that **I personally have found questionable**" . . . "it's something that has bothered me for a long time."

   b) "Part of me thinks it's my job **to call out scams and bad behavior**."

   c) There is other information "**accusing them of misusing grant money, using the dao to economically benefit the 2 founders personally, and using a relationship to break the rules**."

   d) "**I've done my homework** & gathered receipts because I would never accuse anyone without proof. I've even gone as far as tried to get them to do a KYC where I asked for financial transparency after they approached @womenbuildweb3 to partner with us."

   e) Information accumulated includes "**calling the 2 founders out for commingling personal with the DAO's finances, getting a $1M and continuing to ask for more money**, continuing to get grants despite the grant program at harmony was paused indefinitely."

   f) "I want to reiterate that these are not the actions of every, or even most, members. **These are the actions of the people at the top**."

   g) "**I don't pretend to know 100% of the facts**, only what has been present. It's **very clear that there have been violations** . . . ."

   h) "I personally tried to clear their name and get the green light to partner them by sending them a dao KYC where we asked for financial transparency. You can view the KYC here. It was never filled out and returned."

   i) "This is obviously something that has been weighing on me. **I run an organization dedicated to advancing womens & nb ppls careers. And this type of grifting only hurts everyone**."

   j) "The 'women' space in crypto is turning **more and more slimy every day. People are grifting hard af under the guise of "empowering women**." I'm disgusted honestly and don't even want to be associated with those groups."

---

[15] The bold or underlining set forth below is emphasis added for purposes of this defamation-based lawsuit and did not appear as emphasized to the public originally.

KARPF, KARPF, & CERUTTI P.C.
(Pro Hac Vice Counsel)
8 Interplex Drive, Suite 210
Feasterville-Trevose, PA 19053
Phone: 215.639.0801
Fax: 215.639.4970

BAY OAK LAW
1939 Harrison St, Suite 929
Oakland, CA 94612
Phone: 510.208.5500
Fax: 510.208.5511

k) "This is not an invitation to harass individual members of the organization. **My thinking is that most of the members had no idea of the bad behavior for the people at the top**."

l) "**And a plug: If you want to support an organization with complete financial transparency and a proven track record check out @womenbuildweb3**."

m) "I feel really bad for not speaking up earlier. This org focuses on beginners and people new to crypto. Think I could have probably protected a lot more people if I would have spoken up earlier."

*See* Garzon Tweets, dated October 13, 2022, attached as Exhibit E.

52. In Defendants continued online postings on October 13, 2022 (through their Twitter account), Defendants cut and pasted online statements stating Plaintiffs were "**professional fraudsters**" and a host of other false, defamatory, misleading commentary. *Id.*

53. Defendants had **tens of thousands of Twitter followers** who reviewed and read the above-referenced statements about and concerning Plaintiffs (many of whom shared and commented). Additionally, by and through re-posts, shares, and non-followers reading such commentary – tens of thousands of people throughout the United States reviewed Defendants' defamatory statements.

54. Defendants (falsely) publicizing that Plaintiffs were engaging in a scam through Blu3, were professional fraudsters, and its outline of alleged financial impropriety ***was so pervasive*** publicly - - that a Forbes contributor and blogger wrote a story online about Plaintiffs (citing exclusively to Defendants' statements). In said story, published on October 14, 2022, Derick David (hereinafter, "David") (on behalf of "Forbes") published a story titled "DAO That Helps Women Achieve 'Financial Freedom' Accused of Grifting." David publicized that Defendant Garzon was accusing Plaintiffs publicly of financial improprieties. The Forbes publication was again published as *breaking news* as well (a second time).

KARPF, KARPF, & CERUTTI P.C.
(Pro Hac Vice Counsel)
8 Interplex Drive, Suite 210
Feasterville-Trevose, PA 19053
Phone: 215.639.0801
Fax: 215.639.4970

BAY OAK LAW
1939 Harrison St, Suite 929
Oakland, CA 94612
Phone: 510.208.5500
Fax: 510.208.5511

55. It is estimated that within less than a week, **more than 50,000 people** around the United States had been privy to and/or had reviewed Defendants' defamation of Plaintiffs.

56. Defendants' false and defamatory statements were strategically timed to coincide with the Flagship Ethereum global developer DevCon event in Bogota, Colombia.

57. At the time of the DevCon event, Blu3 was at the height of its sponsorship, thus ensuring that Defendants' false and defamatory statements would have maximum negative impact on Plaintiffs.

58. Defendants were acutely aware that Plaintiffs were hosting and running a Women in Web3 Community Hub at DevCon at the time that they posted their false and defamatory statements.

59. As a direct result of Defendants' false and defamatory statements, there was severely reduced participation in Plaintiff's Women in Web3 Community Hub at DevCon.

60. Leading up to DevCon, Blu3 had approximately eighteen (18) committee members and around fifty (50) volunteers.

61. On or about October 14, 2022, Plaintiffs asked Defendants to cease with such lies. Instead of engaging *in any* self-restraint whatsoever, Defendants publicly posted on Twitter for thousands of more people to see: "What lies? I posted public information. If you think I need to dunk on a pair of **low-level scammers** to benefit myself you're mistaken." *See* Garzon Tweets, dated October 14, 2022, attached as Exhibit F.

62. Defendants' defamatory statements were so widely received nationally, that David (from Forbes) was encouraging such continued defamation by commenting as Defendants posted stating: "Not enough. Call major crimes unit."[16]

63. Continuing on October 14, 2022 (as encouraged publicly by Forbes), Defendants publicly posted on Twitter:

   a) "In the coming days they'll post **some fraudulent report** clearing them from wrongdoing. **They're running an elaborate scam with many wallets**. One of them is **literally married to a decision maker at harmony**."

   b) "**Fuck them scammers**"

   c) "Anyways I'm done addressing the scammers. If you're part of blu dao sorry this is happening, & I have no problem with you at all. **You're all victims to a pair of sisters & a husband who have made a lifestyle out of scamming for money**."

*See* Garzon Tweets, dated October 14, 2022, attached as Exhibit F.

64. Shortly after Defendants' false and defamatory statements, Plaintiff's lost approximately ninety (90) percent of their sponsors and eighty (80) percent of their member contributors.

65. Within approximately one (1) month since the filing of this lawsuit, it is estimated that *well over 100,000 online viewers* have become aware of and/or have been privy to Defendants' defamatory statements about and concerning Plaintiffs.

66. As a direct result of Defendants' false and defamatory statements, Plaintiffs have suffered immense harm, including but not limited to:

   a) Plaintiffs' business relations deteriorated so substantially that they lost all sponsors, members, and human capital (including instructors, engineers, and technical expert);

---

[16] *See* David's October 14, 2022 tweet, attached as Exhibit G. David (from Forbes) also posted: "It's enlightening to know that I hold some people's fate in the palm of my hands." David appears to have deleted these tweets, but not before serious damages was done to Plaintiffs' standing and reputation in the Web3 world.

b) Plaintiffs engaged in continual mitigation of harms internally with members, contributors, third parties, and others, but those efforts ultimately failed when all of them ceased their engagement with Plaintiffs;

c) Because a DAO is only as valuable as its number of members, Blu3 ceased operations and stopped operating as a DAO in or around June 2023;

d) Soon and Loh have and will continue to lose business opportunities in the Web3 world;

e) Soon's and Loh's reputations within the Web3 world, particularly among female members, has been irreparably harmed and permanently damaged, so much so that they have been effectively exiled from the Web3 community;

f) Soon and Loh endured substantial emotional distress, inclusive of Loh requiring medical treatment.

67. Meanwhile, Defendants directly benefited from Blu3's collapse and the exit of Soon and Loh from the Web3 world by attracting Plaintiffs' previous members and bolstering their own reputation within the Web3 community by falsely accusing Plaintiffs of fraudulent business practices.

68. Everything stated online by Defendants *is verifiably false*. By way of material examples only:

a) Defendants represented that Plaintiffs had received $1,000,000 from Harmony (as a grant) that was misused by Plaintiffs. In reality, only approximately $75,000 had ever been received by Plaintiffs (which was held in a secure account) and not misused (despite account depreciation due to an underperforming market). **Thus, Defendants' false allegations that Plaintiff received $1,000,000 were utterly false**. In fact, because all of Blu3 transactions were transparent and publicly available, Defendants clearly acted with malicious intent when they brazenly posted their false and defamatory statements that were so obviously belied by Plaintiffs' widely available and unassailable public financial transactions that **could not be altered on the blockchain**. The falsity of Defendants' statements was separately verified by Harmony in a public statement, the entity issuing the grant on or October 14, 2022 (in response to Defendants' false statements); and

b) Garzon's statement that she personally tried to clear Plaintiffs' name is false because, on or about August 25, 2022, Soon had messaged Garzon that she had a family emergency and needed to rush home to Malaysia as her dad was dying and asked Garzon to circle back on the KYC when she returned to the

United States. However in Garzon's defamatory tweets, **she failed to include this material detail**.

    c) Plaintiffs issued public statements with links to other financial information and disclosures showing that **everything stated by Defendants was verifiably untrue and inaccurate**.

69. Defendants in fact lied to the public that they "did [their] homework," "gathered receipts," and that referencing Plaintiffs' business as a scam was based upon careful review or due diligence. In fact, Defendants had no meaningful financial information or data underlying their egregious and malicious false statements.

70. Despite being subject to an online smear campaign that – *in this day and age can cause a business to crumble under the sheer weight of allegations alone* – Plaintiffs did not reciprocate with any attacks against Defendants. Instead, as consummate professionals with unwavering integrity, Plaintiffs have merely asked for Defendants to cease engaging in such falsehoods.

71. Defendants have not retracted any statements, removed publications, apologized, informed followers of errors or falsehoods, or attempted to mitigate the harms caused to Plaintiffs **in any manner**.

72. Defendants advertise extensively for their services, products, and offerings by and through usage of Twitter and other social media platforms. Defendants, who are direct competitors of Plaintiffs, utilized the forum for promotion of their products and services to defame Plaintiffs, to harm the business of Plaintiffs, and to gain commercial advantages.

73. The actions as outlined by Defendants in this lawsuit were reckless, malicious, intentional, and performed with the goal and motive of destroying a competitive business (as operated by Plaintiffs) for Defendants' personal gain.

KARPF, KARPF, & CERUTTI P.C.
(Pro Hac Vice Counsel)
8 Interplex Drive, Suite 210
Feasterville-Trevose, PA 19053
Phone: 215.639.0801
Fax: 215.639.4970

BAY OAK LAW
1939 Harrison St, Suite 929
Oakland, CA 94612
Phone: 510.208.5500
Fax: 510.208.5511

# First Cause of Action
## Violations of the Lanham Act, 15 U.S.C. §§ 1051 *et. seq.*
### - Against Both Defendants –

74. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

75. The elements of a Lanham Act § 43(a) false advertising claim are: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product or services; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and, (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products. 15 U.S.C. § 1125(a)(1)(B); *Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1110 (9th Cir. 2012).

76. Plaintiffs meet all of the foregoing elements, as outlined in this lawsuit (as well as other aspects of a Lanham Act claim). Such false statements about Plaintiffs caused substantial business loss and reputational harm (amongst other losses of goodwill). *See also Sidense Corp. v. Kilopass Tech. Inc.*, 2012 U.S. Dist. LEXIS 115904, *30 (N.D. Cal. 2012) (denying summary judgment when competitor publicized false statement to large audience that the plaintiff continued to offer licenses despite patent improprieties - - explaining defamatory statements by a competitor constitute a Landham Act claim).

77. Defendants intentionally violated the Landham Act, entitling Plaintiffs to: (a) actual damages; (b) treble damages: (c) attorney's fees; and (d) costs (also provided under said Act). Plaintiffs seek all other remedies permitted by law as well.

**Second Cause of Action**
**Defamation & Defamation *Per Se***
**- Against Both Defendants -**

78. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

79. Defendants: (1) published online statements about Plaintiffs seen by (a minimum of) tens of thousands (and likely hundreds of thousands) of people; (2) they were knowingly false; (3) Defendants had no plausible privilege; and, (4) Plaintiffs suffered serious and ongoing (permanent) harm as previously summarized *supra.*

80. Even though Plaintiffs are able to demonstrate special damages, Defendants' libelous statements *per se* exposed Plaintiffs to hatred, contempt, ridicule, impacted their occupations, and accused them of crimes. As a result, the defamation is so serious as to constitute material libelous *per se*, not even requiring demonstration of "special damages." *See e.g. Yow v. Nat'l Enquirer, Inc.*, 550 F. Supp. 2d 1179, 1183, 2008 U.S. Dist. LEXIS 28616, *8, (E.D. Cal. 2008).[17]

81. Plaintiffs seek <u>in excess of $5,000,000</u> for emotional distress, reputational harm, business-related damages, *and for punitive damages* due to Defendants' malice, willfulness and recklessness. *See e.g. King v. U.S. Bank National Assn.*, 53 Cal. App. 5th 675, 720 (Cal. App. Ct. 2020) (affirming award of <u>several million dollars</u> for reputational harm and punitive damages for recklessly false statements in defamation claim).

82. The actions as outlined in this lawsuit constitute both defamation and defamation *per se*, and Plaintiffs seek all damages available by law.

---

[17] Defendants' defamatory statements also fall squarely within categories of Cal. Civ. Code § 46.

KARPF, KARPF, & CERUTTI P.C.
(Pro Hac Vice Counsel)
8 Interplex Drive, Suite 210
Feasterville-Trevose, PA 19053
Phone: 215.639.0801
Fax: 215.639.4970

BAY OAK LAW
1939 Harrison St, Suite 929
Oakland, CA 94612
Phone: 510.208.5500
Fax: 510.208.5511

## Third Cause of Action
### Intentional Interference with Current or Prospective Contractual Relations
### - Against Both Defendants -

83. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

84. Defendants' actions as outlined throughout this lawsuit were calculated, intentional, and designed to cease, obstruct, limit or completely end Plaintiffs' ongoing / prospective business relations (both, actual and potential).

85. Defendants knew at all times it was publicizing blatantly false information in forums publicly that would be viewed by the Web3 audience nationwide, lessening Plaintiff's sponsors, goodwill, contributors, members, and other affiliates.

86. Defendants engaged in such malicious practices towards Plaintiffs in effort to gain more market share.

87. Defendants' actions as outlined in this lawsuit constitute intentional interference with actual or prospective contractual relations.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A. Defendants are to be enjoined from further publications about Plaintiffs, to be ordered to issue an apology and retraction, to remove any and all statements about or concerning Plaintiffs, and to engage in all appropriate legal and equitable mitigation of harms caused to Plaintiffs;

B. Defendants are to compensate Plaintiffs, reimburse Plaintiffs, and make Plaintiffs whole for any and all financial harms to Plaintiffs, including but not limited to lost business, reputational harm, decreased earning potential, and other injuries;

C. Plaintiffs are to be awarded punitive, liquidated, treble or other penalty damages, as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to

punish Defendants for their willful, deliberate, malicious and outrageous conduct and to deter Defendants or other Web3 world community entities and members from engaging in such misconduct in the future;

D. Plaintiffs are to be accorded other equitable and legal relief as the Court deems just, proper, and appropriate (including but not limited to damages for emotional distress / pain and suffering); and

E. Plaintiffs are to be awarded the costs and expenses of this action and reasonable attorney's fees as provided by applicable federal and state law;

F. Plaintiffs are to receive a trial by jury on all issues so triable pursuant to Fed. R. Civ. P. 38.

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By: /s/ *Benjamin D. Salvina*
Benjamin D. Salvina, Esq. (*pro hac vice*)
8 Interplex Drive, Suite 210
Feasterville-Trevose, PA 19053
bsalvina@karpf-law.com

**BAY OAK LAW**

By: /s/ *Andrew K. Jacobson*
Andrew K. Jacobson, Esq. (CSBN: 148583)
1939 Harrison Street, Suite 929
Oakland, CA 94612
andy@bayoaklaw.com

Dated: _____